Filed 7/9/24  In re J.F. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.F., a Person Coming Under the Juvenile Court Law. | B331573<br>(Los Angeles County<br>Super. Ct. No. 20CCJP03412A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>D.F.,<br><br>    Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County.  Lucia J. Murillo, Judge Pro Tempore. Affirmed.

        David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

D.F. (mother) appeals from the juvenile court order terminating her parental rights over her daughter, J.F. (minor, born July 2016).[1]  She contends that the juvenile court's order must be reversed because she was denied effective assistance of counsel[2] during the permanency planning phase of these proceedings and at the Welfare and Institutions Code section 366.26[3] hearing.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Section 300 petitions and hearings*

In June 2020, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition

---

[1]    Demetrice P. (father), minor's father, is not a party to this appeal.

[2]    On January 30, 2024, mother filed a petition for habeas corpus raising this same argument.  (Case No. B334788.)  We considered her petition concurrently with this appeal and denied it.

[3]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

on behalf of minor and her younger half-sibling, K.S.[4]  The petition alleged that K.S. was at risk of harm due to his father engaging in threatening acts toward mother (counts a-1 and b-2), and both children were at risk of harm as a result of mother's history of substance abuse and abuse of marijuana in the home (count b-1) and mother having marijuana in the home within access to the children (count b-3).  At the detention hearing, the juvenile court appointed counsel to represent mother and ordered minor to remain released to mother.

In August 2020, DCFS filed an amended section 300 petition on behalf of the two children.  The petition included the original counts and additionally alleged that the children were at risk of harm based on father's history of engaging in violent conduct with mother and other unnamed partners, including a threat to kill mother while she was pregnant with minor in 2016, and which had resulted in his arrests in 2017 and 2018.  The juvenile court maintained its prior detention orders.

In November 2020, the juvenile court held a combined jurisdiction and disposition hearing.  It sustained counts b-1 and b-2 as slightly amended by interlineation, dismissed the remaining counts, and assumed jurisdiction over minor pursuant to section 300, subdivision (b)(1).  Thereafter, it declared minor a dependent of the court, ordered minor removed from father's custody and to remain placed in mother's custody, and granted mother family maintenance services.  Mother's case plan consisted of random or on-demand drug testing for six months

---

[4]     Jurisdiction over K.S. was terminated on April 25, 2022, granting mother and K.S.'s father joint legal custody and giving K.S.'s father sole physical custody of the child.

and a full drug treatment program if she showed a positive test with increasing levels, a parenting program, and individual counseling to address case issues.

*Section 342 and section 387 petitions, interim review reports, and hearings*

In January 2021, DCFS filed a section 342 petition and a section 387 petition on behalf of the two children. The section 342 petition alleged that the children were at risk of harm based on mother and her male companion, Jay M.[5] (Jay), engaging in a violent altercation in which Jay choked and pushed mother, and mother failing to protect the children from Jay by allowing him to frequent the home and have access to the children (counts a-1 and b-1). The section 387 petition alleged that the previous disposition had not been effective in protecting the children because mother had a history of substance abuse and was arrested for driving while being under the influence of drugs in September 2020 (count s-1).

In February 2021, DCFS filed an amended section 342 petition on behalf of the children. The amended petition included the original counts and additionally alleged that the children had been harmed and/or were at risk of harm based on mother physically abusing minor in the past by forcibly striking the child with a belt (counts a-2, b-2, j-1) and mother failing to protect minor from being physically abused by Jay, who had forcibly struck the child with his hands (counts a-3, b-3, and j-2). At the detention hearing, the juvenile court ordered minor detained from mother's custody and granted mother monitored visitation.

---

[5]     Jay is sometimes referred to as Jared M.

In April 2021, DCFS reported minor had been placed in the home of caregiver and nonrelated extended family member Ms. P. In March 2021, Ms. P. reported that some incidents had recently occurred involving mother and Jay. On one occasion, mother and Jay called Ms. P. and demanded that she give mother a portion of any money that Ms. P. was receiving for caring for minor. On other occasions, mother called and demanded to speak to minor; Ms. P. heard Jay yelling in the background that Ms. P. needed to answer to mother. In mid-March 2021, Jay and some of mother's friends harassed Ms. P. in her car while she was driving minor.

In April 2021, the juvenile court held adjudication and disposition hearings on the amended section 342 and 387 petitions. The juvenile court sustained count b-1 and dismissed the remaining counts of the section 342 petition, finding true that mother and Jay had engaged in a violent altercation in which Jay choked and pushed mother, and mother failed to protect the children from Jay by allowing him to frequent the home and have access to the children. The juvenile court sustained count s-1 of the section 387 petition, finding that the previous disposition had not been effective in protecting the children. It ordered minor removed from parental custody and granted mother family reunification services. Mother's case plan consisted of, among other things, monitored visitation.

*Six-month review period and hearing (§ 366.21, subd. (e))*

In October 2021, DCFS reported that minor continued to live with Ms. P., who provided her with support and affection. Because minor had behavioral issues that included her becoming physically aggressive toward others, she was receiving therapeutic services that included an Intensive Field Capable Clinical Services (IFCCS) team. Minor was "continu[ing] to share

5

a lot of stories describing incidents witnessed in the home of mother that involved violence" and had "identified her fear of being physically disciplined if she [told] what . . . happened in [mother's] home."

Mother was not in compliance with her case plan. Although she was scheduled to have visitation three times per week, three hours per visit, Ms. P. reported that mother failed to attend many visits and, when she did attend a visit, she often arrived late or left early. In August 2021, DCFS held a Child and Family Team (CFT) meeting with mother, during which mother claimed that she was no longer in a relationship with Jay and had no contact information for him.

On October 25, 2021, the juvenile court held the six-month review hearing. It found that continued jurisdiction was necessary, mother had not made substantial progress with her case plan, and returning minor to parental custody would be detrimental to the child. Family reunification services were ordered for an additional six months, and DCFS was ordered to provide a written monitored visitation schedule.

*12-month review period and hearing (§ 366.21, subd. (e))*

During this review period, minor continued to live with Ms. P., who was cooperative with DCFS and continued to meet the child's health and educational needs. Minor appeared to be thriving in the home and was developing a close bond with her caregiver. Minor also continued to receive therapeutic services.

Mother was still not in full compliance with her case plan. She was not participating in conjoint counseling with minor because of her continued struggles with sobriety and minor working through her behavioral issues, which DCFS ascribed to

6

the child having been exposed to domestic violence between mother and Jay.

Up until March 2022, mother was having regular monitored visits with minor at a Chuck E. Cheese restaurant. Minor was happy to see mother and sad when visits ended, and mother brought games and snacks to these visits. However, during a March 2022 visit, mother reportedly pinched minor when she and minor were unsupervised. Following this reported incident, minor refused to have further visits with mother.

On April 25, 2022, the juvenile court held the 12-month review hearing. Mother testified that she had ended her relationship with Jay in mid-2021 and that the last domestic violence incident between them occurred around that time.

The juvenile court found that continued jurisdiction was necessary, mother had only made partial progress with her case plan, and returning minor to parental custody would be detrimental to the child. Family reunification services were continued for another six months, and the juvenile court maintained mother's case plan, including monitored visitation.

*18-month review period and hearing (§ 366.22)*

During this review period, minor continued to thrive with Ms. P. and receive therapeutic services.

Mother was in partial compliance with her case plan. She was still not visiting with minor due to the child's continued refusal to do so. A DCFS social worker spoke with minor via the telephone and during monthly home visits to encourage the child to communicate with mother to no avail. When the social worker would ask minor if she would be open to a visit that would be monitored by a social worker, the child became upset, cursed at

7

the social worker, and became physically aggressive toward Ms. P. or her therapist.

In June 2022, DCFS had a CFT meeting with mother, during which mother accused Ms. P. of "coaching [minor] into not wanting to have visits" with her. DCFS social workers told mother that they would work with minor and her service providers to see if visitation could be resumed.

In July 2022, the social worker and the child's IFCCS team had a meeting to discuss how to assist minor with resuming visits with mother. The IFCCS team stated that they would continue to consult with minor on a weekly basis regarding visits.

In mid-October 2022, DCFS obtained a police report about a domestic violence incident between mother and Jay that had occurred in February 2022, which mother had not previously disclosed to DCFS.

On October 13 and 26, 2022, the juvenile court held the 18-month review hearing. It admitted multiple DCFS reports into evidence and heard testimony from mother.

Mother said that she called the police on Jay in June 2022 for becoming physically aggressive with her after they encountered each other on a bus; she had not seen Jay for one year prior to that incident. Mother did not mention the February 2022 incident. Mother also denied pinching minor in March 2022.

After entertaining this evidence and oral argument, the juvenile court found that continued jurisdiction was necessary, mother had only made partial progress with her case plan, and returning minor to parental custody would be detrimental to the child. In making its findings, the juvenile court stated that mother was not credible. It terminated mother's family

8

reunification services and set a section 366.26 hearing.  Finally, the juvenile court expressly ruled that all prior orders not in conflict with these new orders were to remain in full force and effect.

*Section 366.26 report*

Following the 18-month review hearing, minor continued to live and thrive with Ms. P., who was confident that she would be able to provide the child with a happy, stable, and safe home through adoption if parental rights were terminated.  Minor continued to refuse to have any visits with mother despite the IFCCS team consulting with the child on a weekly basis on this issue.  Ms. P. also told DCFS that minor once "destroyed her living room and broke her television" after a social worker had asked the child about resuming visits with mother.

DCFS also reported that it had received a video that was filmed in June 2021 in which minor told Ms. P. that mother wanted minor to lie about Ms. P. and the social workers.

*Mother's section 388 petition and hearing*

On February 22, 2023, mother filed a section 388 petition, in which she requested reinstatement of her family reunification services.  Mother asserted that her circumstances had changed because she was no longer in a relationship with Jay and she had completed some service programs, and it was in minor's best interests to be "reunite[d] with a parent who has continued to work on her case plan and resolve the issues that brought this case to court."

That same day, the juvenile court held an interim hearing that was scheduled as a section 366.26 hearing.  The court asked mother's counsel why an evidentiary hearing should be held on the petition, particularly with respect to section 388's second

prong (minor's best interests), given the record's demonstration of a lack of visits between minor and mother. Counsel responded that DCFS's reports did not indicate why minor had refused to visit mother, and that Ms. P.'s brother, Archie M. (Archie), had called mother and said that minor had been asking about her. Counsel for DCFS and minor each replied that DCFS's reports did indicate minor's reasons for refusing to visit mother, namely the fact that minor had experienced trauma while in her care, and that DCFS social workers and the IFCCS team had been addressing this issue with the child.

The juvenile court summarily denied the petition, stating that, "even with an evidentiary hearing," mother would "be unable to make out the [best interest] prong given the age of the case and the refusal by the minor to visit."

*Initial section 366.26 hearing*

On May 31, 2023, the juvenile court held the initial section 366.26 hearing. The matter was continued so that DCFS could provide a supplemental report that assessed whether the beneficial parental relationship exception to adoption potentially applied to one or both of the parents.

*Last minute information for the court*

In July 2023, DCFS reported some evidence that pertained to each element of the beneficial parental relationship exception. The report also noted: (1) mother told minor to make up lies about Ms. P. and the social workers in June 2021, (2) minor had been refusing to visit mother since March 2022 and once destroyed items in Ms. P.'s home when asked about resuming visits with mother, and (3) the IFCCS team reported that they would continue to consult with minor on a weekly basis as to

10

visits with mother. Based on the reported information, DCFS believed that the exception was inapplicable.

*Continued section 366.26 hearing*

At the onset of the July 19, 2023, hearing, mother's counsel asked for a continuance and sought to enter into evidence a purported recording of a June 2023 telephone conversation between mother and minor. Counsel for minor and DCFS objected.

The juvenile court ordered mother's counsel to provide a transcript of the recorded conversation for the purpose of learning the reasons behind the conversation and the recording of it to avoid "any due process issues on appeal in the event parental rights are terminated." The court also ordered DCFS to interview Archie to learn "how he facilitated a conversation between [minor] and mother, why it happened, what kind of contact he has with [minor], [and] how often he sees [minor] and [Ms. P.]," and to provide a report with the obtained information. At the request of minor's counsel, the court admonished mother not to record any further conversations between her and the child or to promise minor that she would be returning to mother's care, advising mother that "it is against the law to record [phone] conversations without people's consent."

*Last minute information for the court*

In August 2023, a DCFS social worker interviewed mother, Ms. P., the IFCCS team, and Archie in order to investigate the recorded telephone conversation between minor and mother.

Mother played the recording of the telephone conversation for the social worker, which had taken place on Archie's and the maternal grandmother's phones. The conversation lasted around five to 10 minutes, during which mother asked minor if she

11

missed mother and the maternal grandmother, and minor replied "'Yeah.'" Minor was generally quiet during the conversation and sounded nervous when responding to mother's questions.

Ms. P. reported that she, Archie, and minor were at a family event at the time that this telephone conversation occurred. Ms. P. acknowledged that minor was allowed to have unmonitored contact with the maternal grandmother but not with mother. Ms. P. also said that she was initially confused as to why minor had become upset at the event and wanted to leave early, and only learned later about the child's unauthorized conversation with mother.

The IFCCS team informed the social worker that minor was "very upset about the situation" and felt that she may have caused Ms. P. to "get into trouble." The team also said that minor had not expressed any interest in further visits with mother.

Archie said that he had known mother for a few years, wanted to help mother in her efforts to stay in contact with minor, and did not know that the child had previously expressed not wanting to have contact or visits with mother. Archie also disclosed that he felt "like he was placed in the middle of this case" without sufficient knowledge about it.

*Section 366.26 hearing (Sept. 7, 2023)*

The juvenile court admitted multiple DCFS reports into evidence. Over DCFS and minor's objection, it also admitted into evidence a transcript of the June 2023 recorded telephone conversation, noting that it would give the document "the weight it is due." The juvenile court then entertained oral argument.

Mother's counsel asked the juvenile court to apply the beneficial parental relationship exception and referenced its three elements. As for the first element, counsel admitted that

12

mother had not maintained regular contact or visitation with minor based on the child's refusal to visit after March 2022. Counsel claimed that the real reason minor did not want to visit mother was because she was being coached by Ms. P. to make these statements. As for the second element, counsel pointed out that minor had lived with mother for the majority of her life, knew mother was her mother, and had a "close relationship" with mother. As for the third element, counsel argued termination of parental rights would mean that minor "would lose a connection with her biological family and family members who want to be part of her life."

Minor's and DCFS's respective attorneys asked the juvenile court to find the child adoptable and that no statutory exception applied. Regarding the June 2023 recorded conversation, minor's counsel noted that the child was under the impression that she would be talking with maternal grandmother before mother came onto the phone call, and that it was "highly inappropriate" for mother to have unmonitored contact with the child and for the conversation to be recorded. As for the raised exception, DCFS's counsel contended that mother failed to meet her burden in proving all three elements, and that "affection" between a parent and child does not prove the exception.

The juvenile court found minor to be adoptable and that no statutory exception to adoption applied. In so ruling, the court expressly noted that minor had refused to visit mother despite involvement with her IFCCS team and her therapeutic services provider, there was no evidence that anyone had coached minor to refuse visits, and there was evidence that minor was "trapped" into having a phone conversation with mother in June 2023.

Parental rights were terminated, and Ms. P. was designated as minor's prospective adoptive parent.

*Appeal*

Mother's timely appeal ensued.

## DISCUSSION

Mother contends that the juvenile court's order terminating her parental rights to minor must be reversed because she did not receive effective assistance of trial counsel. Specifically, she argues that trial counsel was ineffective for failing to file a section 388 petition on mother's behalf, requesting reinstatement of family reunification services during the period between counsel's discovery of the June 2023 telephone conversation and the September 2023 section 366.26 hearing. According to mother, had "[a] section 388 petition been filed, the DCFS monitor who was present at the March 2022 monitored Chuck E. Cheese visit, Archie, the social worker who interviewed Archie, mother, [Ms. P.], and possibly [minor] herself could have been called as witnesses to establish the best interest prong of a section 388 petition. [Also,] [t]he social worker could have been cross-examined as to why she failed to follow the juvenile court's specific direction to interview Archie 'on how he facilitated a conversation between [minor] and mother [and] why it happened.'"

I. *Standard of review and relevant law*

As both parties point out, "[a] parent in a dependency proceeding is entitled to competent counsel and to judicial review of claims of ineffective assistance of counsel. [Citations.]" (*In re M.F.* (2022) 74 Cal.App.5th 86, 108; see § 317.5.) "To establish ineffective assistance of counsel in dependency proceedings, a parent 'MUST DEMONSTRATE BOTH THAT: (1) [her]

14

appointed counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent advocates; and that (2) this failure made a determinative difference in the outcome, rendering the proceedings fundamentally unfair in that it is reasonably probable that but for such failure, a determination more favorable for [the parent's] interests would have resulted.' [Citations.] In short, [the] appellant has the burden of proving both that [her] attorney's representation was deficient and that this deficiency resulted in prejudice." (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98.)

"When a parent seeks to assert ineffective assistance of counsel on direct appeal (as opposed to by writ of habeas corpus), appellate courts further limit their review to consider only those claims "'where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction.'" [Citation.]" (*In re M.F.*, *supra*, 74 Cal.App.5th at p. 109.)

Pursuant to section 388, a parent of a dependent child may petition the juvenile court for a hearing to modify a previous order based on changed circumstances or new evidence. (§ 388, subd. (a)(1).) "The parent seeking modification [of an order under section 388] must 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]' [Citations.] There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the [child]." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; see also *In re Stephanie M.* (1994) 7 Cal.4th 295.) In determining whether the parent has met her burden, "the court may consider the entire factual and procedural

15

history of the case." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

II. *Mother was not denied effective assistance of counsel*

We conclude that mother's appointed counsel was not deficient for failing to file a section 388 petition on mother's behalf.[6] Mother has not demonstrated that trial counsel was incompetent by failing to file a section 388 petition between June 2023 and September 2023.

Urging us to conclude otherwise, mother directs us to her June 2023 recorded telephone conversation with minor. According to mother, trial counsel should have brought a section 388 petition asking for visitation based upon the contents of that telephone conversation. For the reasons set forth below, we reject mother's argument; trial counsel may have had a tactical reason for not filing a section 388 petition based upon the recorded telephone conversation.

A. The June 2023 recorded telephone conversation

1. *Violation of the juvenile court's order for monitored visitation*

The June 2023 recorded telephone conversation was an express violation of the juvenile court's order that mother's visitation with minor be monitored.

This monitored visitation order had been in place since February 2021, or for over two years in the underlying proceedings. Despite the juvenile court's clear instructions, mother willfully violated the order when speaking to minor over

---

[6] Mother also seems to argue that the juvenile court erred in denying her visitation in March 2022 "without a finding of detriment." The juvenile court made no such order in March 2022.

16

the telephone at a time when minor believed that she would be speaking to her maternal grandmother, which was allowed.  As such, a reasonably competent attorney would not have filed a section 388 petition requesting the reinstatement of family reunification where the information that formed the basis of the request was obtained through the parent's willful violation of a court order.  (See Civ. Code, § 3517 ["No one can take advantage of his own wrong"]; see also § 213 ["Any willful disobedience or interference with any lawful order of the juvenile court . . . constitutes a contempt of court"]; *People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091–1092 [counsel is not required to make futile motions to appear competent].)

## 2. *Recording was inadmissible*

The recording of the telephone conversation (and the transcript thereof) were inadmissible under state law.  Penal Code section 632 expressly forbids the recording of confidential communications without the consent of all parties and makes such recordings inadmissible "in any judicial, administrative, legislative, or other proceeding."  (Pen. Code, § 632, subd. (d).)  For the purposes of this statute, a confidential communication "means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."  (Pen. Code, § 632 subd. (c), partially abrogated as to criminal proceedings as stated in *People v. Guzman* (2019) 8 Cal.5th 673, 679–684.)  Mother did not have

17

the right to consent to the recording of the conversation on minor's behalf because minor was a dependent of the court and was represented by her own counsel.  (See *In re L.J.* (2023) 89 Cal.App.5th 741, 752 [in dependency proceedings, a child's appointed counsel serves as the child's guardian ad litem and is responsible for protecting the child's best interests].)  A reasonably competent attorney would not have filed a section 388 petition based upon an illegal telephone recording.  (*People v. Torrez, supra,* 31 Cal.App.4th at pp. 1091–1092.)

   3. *Recording did not establish a prima facie showing of changed circumstances or new evidence*

  Even if the juvenile court properly admitted and considered the recorded telephone conversation for the purposes of a section 388 petition, the substance and context of the conversation did not make a prima facie showing of changed circumstances or new evidence.  (See § 388; *In re Anthony W., supra,* 87 Cal.App.4th at p. 250.)  "The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order.  [Citations.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

  Following the 18-month review hearing in October 2022, minor continued to live with Ms. P., who had consistently been providing minor with a happy, stable, and safe home.  Meanwhile, minor continued to refuse to have any visits with mother.

  The June 2023 telephone conversation confirmed that minor did not want to reunify with mother.[7]  Although minor

---

[7] Mother complains that DCFS did not comply with the juvenile court's order that it interview Archie to learn "how he

18

responded to mother's question as to whether she missed her and her maternal grandmother in the affirmative, minor was generally quiet during the conversation and sounded nervous when responding to mother's questions. Following that conversation, minor became quiet, with Ms. P. only learning later about the child's unauthorized conversation with mother.

Notably, the IFCCS team reported that minor was upset about the situation, but not because she wanted to have a relationship with mother; she was upset because she felt that she may have caused Ms. P. to "get into trouble." In fact, the team again confirmed with minor that she did not want to visit with mother.

### 4. *No prejudice*

Even if counsel had filed a section 388 petition as mother insists, it is not reasonably probable that the juvenile court would have found that mother made a prima facie showing that circumstances had changed or that the requested relief was in minor's best interests.

As of June 2023, the following information was known to the juvenile court: (1) minor had been a dependent of the court for two and one-half years; (2) mother had already received 18 months of family reunification services, which were terminated in October 2022; (3) minor did not want further visits with mother based in part on having experienced trauma while in her care; (4) minor became verbally and physically aggressive on separate occasions when asked if she would be open to resumed monitored visits with mother; (5) minor was thriving in Ms. P's home, where

facilitated a conversation between [minor] and mother [and] why it happened." As set forth above, the appellate record affirms that DCFS spoke with Archie about the telephone conversation.

19

she had lived since April 2021; (6) Ms. P. sought to adopt the child if parental rights were terminated; and (7) the section 366.26 hearing was originally scheduled to occur in February and May 2023. In light of this information, it is not reasonably probable that mother would have satisfied the statutory requirements of section 388 had counsel filed a petition for modification on mother's behalf. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [once the parent has been given a reasonable period of time to reunify with children and has been unsuccessful, "the child's interest in permanency and stability takes priority"]; *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317 ["After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount"]; see also *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 627 ["to promote the prompt resolution of the child's custody status and her permanent and stable placement, the law sets a presumptive 18-month limit on reunification services"].)

20

**DISPOSITION**

The juvenile court's order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ